UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
In Re: NEW YORK CITY ASBESTOS LITIGATION
-------------------------------------------------------------------X
FRANK KIEFER and MYRTLE KIEFER,

                    Plaintiff,                  Index No: 1:12-cv-7613-KBF

                -against-             **AFFIRMATION IN OPPOSITION TO DEFENDANT CRANE COMPANY'S MOTION FOR SUMMMARY JUDGMENT**

A.O. SMITH WATER PRODUCTS CO., et al.,

                   Defendants.
-------------------------------------------------------------------X

       DAVID A. CHANDLER, being duly licensed to practice as an Attorney and Counselor at Law before the Courts of this State, does hereby affirm under the penalties of perjury that:

       1.      I am an Associate with the law firm of Weitz & Luxenberg, P.C., attorneys for the Plaintiff. As such, I am fully aware of the facts and circumstances of this case.

       2.      Plaintiff, Frank Kiefer, respectfully submits this affirmation in opposition to the motion for summary judgment filed by Defendant, Crane Co. (hereinafter "Crane " or "the Defendant") in this case arising from plaintiff's asbestos-related injuries sustained as a result of his exposures to the asbestos materials removed from valves manufactured by Crane.

       3.      Crane brings this motion without disputing that Mr. Kiefer was exposed to asbestos during his work as a director of maintenance facilities, working on, and in the vicinity of Crane valves. Instead, Crane argues that it should not be held liable for

1

Plaintiff's injuries because, *inter alia*, it did not supply, specify, or recommend the use of components inside any of its valves.

4.      Mr. Kiefer suffered and died from malignant mesothelioma.  Mr. Kiefer was diagnosed with Mesothelioma on August 9, 2012.  *See* Pathology Report dated August 9, 2012, attached hereto as **Exhibit 1.**  Mr. Kiefer passed away on October 15, 2012.  *See* Death Certificate, attached hereto as **Exhibit 2.**  Lorenzo Galante, Mr. Kiefer's co-worker, was deposed on November 27 and December 18, 2012.  *See* Deposition Transcript of Lorenzo Galante, attached hereto as **Exhibit 3.**

**A.  Lorenzo Galante Specifically Identified Crane Valves as the Source of Frank Kiefer's Asbestos Exposure.**

5.      Lorenzo Galante testified that from approximately 1980 through the late 1980s or early 1990s, he worked for Burroughs Corporation and Museums at Stony Brook with Frank Kiefer.  *See* Exhibit 3, at 19-22, 57-59.  During that period of time, Mr. Galante worked as a maintenance mechanic and Mr. Kiefer worked as the director of maintenance facilities.  *See id.*  Mr. Kiefer did hands-on work in addition to overseeing the work of the mechanics, which included electrical work, plumbing, carpentry, and HVAC work.  *See id* at 22-25.

6.      Mr. Galante testified that he and Mr. Kiefer were exposed to Crane valves and the asbestos-containing packing contained in Crane valves during their time at Burroughs Corporation.  *See id.* at 144-145.

> Q.      Sir, on your list here you have Crane.  What is Crane?
> A.      Crane I remember packing that we dealt with.
> Q.      And valves?
> A.      Yes.
>         MR. LINDENMAN:  Objection.
> Q.      Is that what you were referring to, valves?
> A.      Yes, packing and valves.  We used to open them up, and there was a little blue and silver packing.  We used to pull out the old one, put the new one in.  We used to -- we had a pile of those things.

Q.      How often do you believe Mr. Kiefer was exposed to asbestos from the Crane valves?

A.      From the packing, I would say all the time.  He was the one that ordered those products and got them in.

*Id.* at 144-145.

\* \* \* \* \*

Q.      How did you know that the valves in question were Crane?

A.      They actually have their name stamped on the side of them.

Q.      When you say "stamped" --

A.      Part of the molding process, from what I can remember.

Q.      Was it a separate color from the body of the valve?

A.      I couldn't tell you.

Q.      Do you know what the valve material was made out of?

A.      The valve material?

Q.      Yes.

A.      I don't remember.  I mean, I dealt with many valves, but I can either say brass or cast.

Q.      Under what circumstances would you come across a Crane valve?  Where would you find a Crane valve at Burroughs?

A.      We had them up in the rafters for different plumbing items, boiler room.  I think at one point in time they were using them on the production floor also.

*Id.* at 170.

\* \* \* \* \*

Q.      I am limiting this to the rafter section.  What would the reason be for you to work with the valves in that section?

A.      Leaking.  Packings would leak on the valves.

Q.      About how high did you say the rafters section was?

A.      Could have been ten feet up.

Q.      You said this section was over the production floor?

A.      Correct.

Q.      How did you access the rafters section?

A.      Ladder.

Q.      Was that a ladder in the middle of the production floor?  Was it on the sides of the building?

A.      Depending where the valve was.

Q.      Did Mr. Kiefer accompany you up to the rafter section each time you replaced a valve?

A.      You had someone up on the ladder.  Sometimes you would have somebody on the bottom of the ladder holding it for you.

Q.      During the times you worked on a Crane valve in the rafter section when you worked on it, were you the only one up there working on the valve at that particular time?

A.      Yes.  Understand I was working off a ladder.

3

Q.      I understand.  That's what I'm trying to understand, envision
        here.  How often would Mr. Kiefer be the one at the top on
        the ladder and you be the one on the bottom?

A.      I couldn't tell you.  I mean, I know he has gone up at times.

Q.      Considering he was the supervisor and you worked for him,
        would it be fair to say the majority of times you worked on a
        Crane valve in the rafter section, you were the one doing
        work on the top on the ladder and Mr. Kiefer was holding it
        to the extent he was working with you?

A.      Can you repeat that?

Q.      Probably not.  Given that Mr. Kiefer was your supervisor
        and you worked for him, is it fair to say that more often than
        not you were the one working on the top of the ladder on the
        valve and Mr. Kiefer was the one on the bottom holding the
        ladder?

A.      Yes.

Q.      Could you give a percentage of what time you were working
        on the valve as opposed to Mr. Kiefer?

A.      I would have to say probably 80 percent.

Q.      Was you?

A.      Was me.

Q.      How often in the course of a month would work on the rafter
        valves be required?

A.      In a month's time?

Q.      Let's go with that.

A.      I would say a few.  I would have to say maybe a dozen.

Q.      All right.  So, roughly --

A.      More than five, less than a dozen.

Q.      So, anywhere from one or two to four times a week, we'll
        say?

A.      Yeah, depending if they were leaking or what have you.

Q.      You said that to the extent that there was exposure to
        asbestos, it was from packing; is that correct?

A.      Correct.

Q.      That was internal to the valve?

A.      Yes.

Q.      Can you tell me how you would access the internal section
        of the valve to reach the packing?

A.      A bonnet nut on top that you would take off and pull the
        packing out.

Q.      Do you know what kind of valves they were, a globe, a
        check, a butterfly, what type?

A.      No.

Q.      What was the size of the valves in the rafter section?  Were
        they uniform or did they vary?

A.      They all varied.  Depending where the branches went to.

Q.      Size?

A.      I would say a half-inch would probably have been the
        smallest in that building.  The largest were maybe four inch,

4

maybe larger.

Q.     All right.  Was packing found in every single valve you worked on?

A.     To my knowledge, yes.

*Id.* at 174-177.

\* \* \* \* \*

Q.     So, when you opened the valve up and saw the packing, what did the packing look like in terms of consistency?

A.     Again, depending what it was, I remember a silver sparkle color, grey.  You know, silver sparkles, grey.  Usually that stuff would just get picked out.  It didn't come out in one solid piece.

Q.     You said you were going up because it was leaking.  Was the packing wet?

A.     Like when it was removed?

Q.     When you went in and opened up the valve to remove the packing because it was leaking, was the packing dry or wet?

A.     Because of the material they are made out of, the packing don't absorb water.  The outer parts were wet, but not the actual packing itself.

Q.     So, you had to pick it out in pieces?

A.     Yeah.  That's the fun part.

*Id.* at 178-179.

\* \* \* \* \*

Q.     How often would you have to work with Mr. Kiefer to repair the valves in the boiler room?

A.     I didn't work in the boiler room a lot.  The more senior guys did that more most of the times, but I remember him being in there a lot of times with them also.

Q.     Do you know how often he was directly performing the work?

A.     In with them?

Q.     Yes.

A.     If I had to put a percentage on for 100, maybe 30 percent of the time he would go in there and take care of something himself.

Q.     The time he was supervising, how close was he to the men working on the valve directly?

A.     Always within arm's reach.

Q.     Not on the lap, but close?

A.     Pretty close.

*Id.* at 186-187.

* * * * *

Q.  As you picked the pieces out, where did they go?

A.  Down to the floor.

Q.  They just dropped to the floor?

A.  Correct.

Q.  You didn't make any effort to try to hold onto it or keep it from falling?

A.  Not standing on a ladder.

Q.  The pieces that you pulled out and fell to the floor, you were able to see them easily, they weren't small, like too small to see?

A.  No, not too small to see.

Q.  Do you know how wide a swath underneath a valve this material may have spread and fallen --

A.  No.

Q.  -- to the floor?  Did Mr. Kiefer work directly underneath you, was the ladder at an angle, what was the setup?

A.  It could have varied.  Sometimes we went over a piece of equipment or over a work station but he would probably always be -- well, he was always at the bottom of the ladder, what we call footing a ladder, holding his feet on the ladder so it wouldn't move.

Q.  And you had alluded to but there was never really any discussion, during the time that you were on the top of ladder and he was on the bottom, how would Mr. Kiefer have been exposed to asbestos from this valve?

A.  It would have been in the packing and from what I remember about the packings and stuff and what my knowledge is today, some of the packings had asbestos in them.  So, as picking it out and it falling down and basically raining on top of him, I'm sure he was exposed to it in that direction.

Q.  You described the pieces that fell as you being able to see them.  Do you believe that Mr. Kiefer inhaled the pieces that you saw?

A.  I would say he didn't inhale the big pieces that I pulled out but the --yeah, out of the picking and, you know, breaking it apart and pulling pieces out, I'm sure he would have -- some of the little particles that were in the air he, you know, would breathe in.

Q.  So, as you were working on the valve and picking the pieces out, you were also disturbing some of the dust in the immediate vicinity around you, right?

A.  Yes, I would say that's fair.

Q.  So, to some degree whatever was falling below you was the Dust that was up there as well as whatever pieces of packing you were pulling out, correct?

A.  Could have been, yes.

Q.  So, you talked about particles, the particles that Mr. Kiefer

6

|     | could have inhaled may have been the dust as opposed to whatever was raining down from the valve; is that right? |
| --- | --- |
| A. | Or both, yes. |
| Q. | Or both, that's fair. And am I correct that at the time you worked with the valves, I mean, this packing, you didn't have specific knowledge as to whether the packing contained asbestos, correct? |
| A. | Correct. |
| Q. | You stated that it was gray with some sparkles and silver and that it's only later that you now understand that you believe that some of that may have contained asbestos? |
| A. | Correct. |

*Id.* at 212-215.[1]

**B.    Crane Recommended and Sold Asbestos-Containing Components, Like Packing and Gaskets, for Use in Their Valves and Even Recommended the Use of External Asbestos-Containing Insulating Cement on Their Valves**

7.    Crane's Answers to Interrogatories concede that their valves contained asbestos components. *See* Crane Co.'s Answers to Plaintiffs' Master Interrogatories and Request for Production re: Case No. CC-99-08033-B, *Malcolm Lee Murphy v. Owens Corning et al.* page 6, attached hereto as **Exhibit 5.** Specifically, page 6 states:

> Crane Co.'s principal line of industrial equipment…was industrial valves….Many of those valves bore the name "Crane", marked directly on the valve. Certain of the valves had enclosed within their metal structure asbestos-containing gaskets, packing, or discs.

Crane Co.'s valves contained asbestos-containing materials from approximately 1858 until the mid-1980's. *See id.* at pg. 9. Crane sold asbestos-containing Cranite gaskets,

---

[1] Crane's suggestion that Mr. Galante's extensive testimony and product identification is inadmissible and should not be considered, and that he had no personal knowledge regarding Mr. Kiefer's exposure to asbestos packing contained within Crane valves, in addition to being belied by the record, has been previously rejected by New York courts and is without merit. *See, e.g., D'Alessandrio v. A.O. Smith Water Prods. Co.,* Index No. 190273/2009 (N.Y. Sup. Ct. August 6, 2010) at 3 (attached hereto as **Exhibit 4**) ("Given this testimony, plaintiff demonstrated that he possessed sufficient knowledge of the facts contained in the document such that its use to refresh his memory was proper. Further, once plaintiff named the defendant as a potential source of his asbestos exposure, he was able to recall specific instances (not contained within the list) of seeing the Crane Co. name on pumps that he worked near in sewage plants as well as the LILCO and Con Ed power plants").

packing, and discs until sometime in the 1970's or 1980's. *See id.* at 8-10 (75%-85% chrysotile asbestos). Crane never provided a warning regarding the asbestos-containing components of their valves until the mid 1980's. *See id.* at pg. 14.

8.     In addition to selling valves with asbestos components, Crane also knew (and even recommended) that asbestos-containing insulation was being applied to the exterior of their valves *to prevent heat loss/dissipation*. In 1925, Crane Co. published a study course manual for Crane employees with a section entitled, "Insulation." *See* Crane Co. "Study Course for Employees," 1925, relevant portions attached hereto as **Exhibit 6.** This section imparts the reasons why insulation was needed on Crane equipment and specifically discusses asbestos insulation. This section is replete with Crane's explicit pronouncements and instructions that high heat applications require insulation, specifically asbestos insulation, on the valves. *See id.* at 156 (discussing the thickness of the "asbestos fibers" when Cranite sheets are "pressed together under heat"; stressing that the "cheaper" Cranite sheets are "unsatisfactory" "under high pressures and temperatures").

9.     Crane <u>sold</u> asbestos-containing materials that were used in association with its equipment, including valves. The asbestos-containing materials that Crane sold included gaskets, packing, pipe-covering, millboard, block, and insulating cement. *See* excerpts from Crane "Valves and Fittings for all Pressure and Purposes, Catalogue No. 51, dated June 1923, attached as **Exhibit 7**; *see* excerpts from "Crane Industrial Supplies," Catalog 45J, dated 1945, attached as **Exhibit 8**; *see* excerpts from "Crane valves fittings pipe fabricated piping," No. 53, dated 1953, attached as **Exhibit 9.** In marketing J-M Asbestos Cement, Crane wrote in its catalog that the asbestos cement was "...well known for [its] excellent coverage, good finish and insulating properties."

Furthermore, "[J-M Cements] are especially suitable for insulating irregular surfaces where it is impractical to apply sectional insulation, sheets, or blocks. *See* Exhibit 7 at 141. Again, this is to ensure that only asbestos-containing cement is used in situations where the maximum Fahrenheit temperature is between 700 and 1000 degrees. *See id.* And, just to be certain that the buyer knew where to apply the Johns-Manville asbestos cement, Crane wrote in subsequent catalogs, "Johns-Manville cements are unexcelled for insulation of irregular surfaces such as on valves, flanges, pipe fittings, etc., or as a surface finish over block or sheet insulations in order to seal joints and to provide a smooth, durable finish." (emphasis added). *See* Exhibit 9, at 455.

10.     In addition, even if Crane had not been so heavily involved in selling and recommending the use of asbestos gaskets, insulating cement, and other asbestos-containing materials for use on and in its valves – which they were – they certainly cannot deny that they were aware that asbestos was being used on and in their valves. As demonstrated above, the 1952 Naval Machinery Manual credits Crane with providing suggestions and descriptive matter, making the manual possible. *See* **Exhibit 10.** This manual, which Crane clearly had a hand in creating, specifies that asbestos gaskets and packing were to be used in valves and asbestos insulating cement on valves when used for high temperature applications. *See id.* This is further demonstrated by Crane Co.'s own schematics for naval vessels, which document its design of naval valves incorporating asbestos containing parts, to wit asbestos valve stem packing, compressed asbestos gasket, and stuffing box packing. *See* **Exhibit 11** (paragraph 16); Chart entitled "List of Materials" at 23 and 42.

11.     Lastly, Exhibit 12 establishes that *Crane did specify the use of asbestos materials for valve and pump packing and gaskets. See* **Exhibit 12.** The first sheet, for example (Crane Co. Drawing m 22419) is Crane's valve specification, and at the top right

box specifies "braided asbestos" as the requisite valve packing material, and "compressed asbestos" for the valve gasket. *Id.* The next page, a Crane "sheet packing" materials sheet dated March 17, 1972, requires that "[t]his packing shall consist of asbestos fiber" and so forth. *Id.* The next page, a "'Cranite' sheet packing" specification dated August 26, 1957, requires that "[p]acking shall consist basically of 75 to 85% Chrysotile asbestos." *Id.* The further pages included in this exhibit similarly evidence Crane's persistent specification of asbestos-containing valve and pump components. *Id.*

**C.    The Summary Judgment Standard**

12.    Based upon the proofs marshaled by Plaintiff herein, it is clear that Defendant's instant motion for summary judgment should be denied. It is well settled in New York that the court must view all of the evidence in the light most favorable to the non-movant. *See Strychalski v. Mekus*, 54 A.D.2d 1068 (4th Dept. 1976); *Henderson v. City of New York*, 178 A.D.2d 129 (1st Dept. 1991). Moreover, summary judgment is a "drastic remedy" that must not be granted if there is "any doubt" about the existence of a triable issue of fact. *See Nicholas Di Menna & Sons v. City of New York*, 301 N.Y. 118 (1950); *Ace Wire & Cable Co. v. Aetna Casualty & Surety Co.*, 60 N.Y.2d 390 (1983).

13.    "On a motion for summary judgment, the court is not to pass on the credibility of the witnesses, but rather must determine whether material issues of fact exist. The function is issue finding, not issue determination." *Stankowski v. Kim,* 730 286 A.D.2d 282 (1st Dept. 2001) (holding that issues that 'turn largely on witness credibility and are inappropriate for summary judgment treatment').

14.    Accordingly, a party moving for summary judgment cannot meet its burden merely by noting gaps or weakness in its opponent's proof. *See Cochrane v. Owens-Corning Fiberglass Corp.,* 219 A.D.2d 557 (1st Dept. 1995)(holding that, in the context of summary judgment proceedings, "[t]he credibility of the parties is not an

appropriate consideration for the court..., and statements made in opposition to the motion must be accepted as true"). *See also Allen v. General Elec. Co.*, 32 A.D.3d 1163 (4th Dept. 2006).

15.    In the same vein, the First Department has unequivocally ruled that "[t]he deposition testimony of a litigant is sufficient to raise an issue of fact so as to preclude the grant of summary judgment dismissing the complaint . . . . The assessment of the value of a witnesses' testimony constitutes an issue for resolution by the trier of fact, and any apparent discrepancy between the testimony and the evidence of record goes only to the weight and not the admissibility of the testimony." *Dollas v. W.R. Grace & Co.*, 225 A.D.2d 319, 321 (1st Dept. 1996).

16.    It is also well settled that, in a personal injury litigation, the plaintiff is not required to show the precise cause of his damages, but only facts and conditions from which defendant's liability can be reasonably inferred.  The same standard is particularly applicable in the context of defendant's motion for summary judgment, where the plaintiff need only show the existence of triable questions of fact, and where any doubt must be resolved against summary resolution. *See Reid v. Georgia Pacific Corp.*, 212 A.D. 2d 462 (1st Dept. 1995); *see also* NYPJI 2:12.  This principle is especially pertinent in the context of asbestos-related personal injury cases, which involve tragic injuries that do not manifest until many years, and typically decades, after the plaintiff's injurious exposures.

17.    Further, because the remedy of summary judgment is a drastic one, the moving defendant is charged with the heavy initial burden of showing that it did not breach its duty of due care and did not cause the harm afflicting the plaintiff. *See Field v. Waldbaum, Inc.*, 35 A.D.2d 652 (2d Dept. 2006); *Jones v. Surrey Coop. Apts., Inc.*, 263 A.D.2d 33 (1st Dept. 1999) (reiterating that, "on [a] motion for summary judgment it was

the movant's burden to establish the non-existence of those elements")(court's emphasis; omitting internal citations). Toward this end, "[t]he proponent of summary judgment must eliminate material issues of fact by producing 'evidentiary proof in admissible form'." *See Zuckerman v City of New York*, 49 N.Y.2d 557 (1980).

18.     As such, a defendant moving for summary judgment must "make a prima facie showing of entitlement to summary judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact." *Ayotte v. Gervasio*, 81 N.Y.2d 1062 (1993)(*quoting Alvarez v. Prospect Hospital*, 68 N.Y.2d 320, (1986)). The failure to make such a showing requires the denial of a summary judgment motion, "regardless of the sufficiency of the opposing papers." *Id.* Every one of the movant's main assertions must be supported by evidence proffered by that movant, because "conclusory assertions are insufficient to demonstrate the absence of any material issues of fact." *Id.*

19.     The Court is respectfully referred to the annexed Memorandum of Law for an analysis of the relevant case law regarding the rebuttal of Crane's "Bare Metal" defense, attached hereto as **Exhibit 13**.

20.     WHEREFORE, for all of the facts marshaled above, and the relevant case law referenced in the Plaintiff's Memorandum of Law, the Plaintiff respectfully submits that Crane's motion must be denied in its entirety.

Dated: New York, New York
November 22, 2013

                                        Respectfully submitted,


                                        By_____
                                        David A. Chandler
                                        WEITZ & LUXENBERG, P.C.
                                        700 Broadway
                                        New York, New York 10003

(212) 558-5914
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
In Re:  NEW YORK CITY ASBESTOS LITIGATION
-------------------------------------------------------------------X
FRANK KIEFER and MYRTLE KIEFER,

|  |  |
|---|---|
| Plaintiff, | Index No: 1:12-cv-7613-KBF |
| -against- | **AFFIRMATION IN OPPOSITION TO DEFENDANT CRANE COMPANY'S MOTION FOR SUMMMARY JUDGMENT** |
| A.O. SMITH WATER PRODUCTS CO., et al., | |
| Defendants. | |

-------------------------------------------------------------------X

DAVID A. CHANDLER, being duly licensed to practice as an Attorney and Counselor at Law before the Courts of this State, does hereby affirm under the penalties of perjury that:

1.      I am an Associate with the law firm of Weitz & Luxenberg, P.C., attorneys for the Plaintiff. As such, I am fully aware of the facts and circumstances of this case.

2.      Plaintiff, Frank Kiefer, respectfully submits this affirmation in opposition to the motion for summary judgment filed by Defendant, Crane Co. (hereinafter "Crane" or "the Defendant") in this case arising from plaintiff's asbestos-related injuries sustained as a result of his exposures to the asbestos materials removed from valves manufactured by Crane.

3.      Crane brings this motion without disputing that Mr. Kiefer was exposed to asbestos during his work as a director of maintenance facilities, working on, and in the vicinity of Crane valves.  Instead, Crane argues that it should not be held liable for

1

Plaintiff's injuries because, *inter alia*, it did not supply, specify, or recommend the use of components inside any of its valves.

    4.      Mr. Kiefer suffered and died from malignant mesothelioma. Mr. Kiefer was diagnosed with Mesothelioma on August 9, 2012. *See* Pathology Report dated August 9, 2012, attached hereto as **Exhibit 1.** Mr. Kiefer passed away on October 15, 2012. *See* Death Certificate, attached hereto as **Exhibit 2.** Lorenzo Galante, Mr. Kiefer's co-worker, was deposed on November 27 and December 18, 2012. *See* Deposition Transcript of Lorenzo Galante, attached hereto as **Exhibit 3.**

**A. Lorenzo Galante Specifically Identified Crane Valves as the Source of Frank Kiefer's Asbestos Exposure.**

    5.      Lorenzo Galante testified that from approximately 1980 through the late 1980s or early 1990s, he worked for Burroughs Corporation and Museums at Stony Brook with Frank Kiefer. *See* Exhibit 3, at 19-22, 57-59. During that period of time, Mr. Galante worked as a maintenance mechanic and Mr. Kiefer worked as the director of maintenance facilities. *See id.* Mr. Kiefer did hands-on work in addition to overseeing the work of the mechanics, which included electrical work, plumbing, carpentry, and HVAC work. *See id* at 22-25.

    6.      Mr. Galante testified that he and Mr. Kiefer were exposed to Crane valves and the asbestos-containing packing contained in Crane valves during their time at Burroughs Corporation. *See id.* at 144-145.

> Q.     Sir, on your list here you have Crane. What is Crane?
> A.     Crane I remember packing that we dealt with.
> Q.     And valves?
> A.     Yes.
>        MR. LINDENMAN: Objection.
> Q.     Is that what you were referring to, valves?
> A.     Yes, packing and valves. We used to open them up, and there was a little blue and silver packing. We used to pull out the old one, put the new one in. We used to -- we had a pile of those things.

Q.      How often do you believe Mr. Kiefer was exposed to
        asbestos from the Crane valves?
A.      From the packing, I would say all the time.  He was the one
        that ordered those products and got them in.

*Id.* at 144-145.

\* \* \* \* \*

Q.      How did you know that the valves in question were Crane?
A.      They actually have their name stamped on the side of them.
Q.      When you say "stamped" --
A.      Part of the molding process, from what I can remember.
Q.      Was it a separate color from the body of the valve?
A.      I couldn't tell you.
Q.      Do you know what the valve material was made out of?
A.      The valve material?
Q.      Yes.
A.      I don't remember.  I mean, I dealt with many valves, but I
        can either say brass or cast.
Q.      Under what circumstances would you come across a Crane
        valve?  Where would you find a Crane valve at Burroughs?
A.      We had them up in the rafters for different plumbing items,
        boiler room.  I think at one point in time they were using
        them on the production floor also.

*Id.* at 170.

\* \* \* \* \*

Q.      I am limiting this to the rafter section.  What would the
        reason be for you to work with the valves in that section?
A.      Leaking.  Packings would leak on the valves.
Q.      About how high did you say the rafters section was?
A.      Could have been ten feet up.
Q.      You said this section was over the production floor?
A.      Correct.
Q.      How did you access the rafters section?
A.      Ladder.
Q.      Was that a ladder in the middle of the production floor?  Was
        it on the sides of the building?
A.      Depending where the valve was.
Q.      Did Mr. Kiefer accompany you up to the rafter section each
        time you replaced a valve?
A.      You had someone up on the ladder.  Sometimes you would
        have somebody on the bottom of the ladder holding it for
        you.
Q.      During the times you worked on a Crane valve in the rafter
        section when you worked on it, were you the only one up
        there working on the valve at that particular time?
A.      Yes.  Understand I was working off a ladder.

3

Q.    I understand.  That's what I'm trying to understand, envision here.  How often would Mr. Kiefer be the one at the top on the ladder and you be the one on the bottom?

A.    I couldn't tell you.  I mean, I know he has gone up at times.

Q.    Considering he was the supervisor and you worked for him, would it be fair to say the majority of times you worked on a Crane valve in the rafter section, you were the one doing work on the top on the ladder and Mr. Kiefer was holding it to the extent he was working with you?

A.    Can you repeat that?

Q.    Probably not.  Given that Mr. Kiefer was your supervisor and you worked for him, is it fair to say that more often than not you were the one working on the top of the ladder on the valve and Mr. Kiefer was the one on the bottom holding the ladder?

A.    Yes.

Q.    Could you give a percentage of what time you were working on the valve as opposed to Mr. Kiefer?

A.    I would have to say probably 80 percent.

Q.    Was you?

A.    Was me.

Q.    How often in the course of a month would work on the rafter valves be required?

A.    In a month's time?

Q.    Let's go with that.

A.    I would say a few.  I would have to say maybe a dozen.

Q.    All right.  So, roughly --

A.    More than five, less than a dozen.

Q.    So, anywhere from one or two to four times a week, we'll say?

A.    Yeah, depending if they were leaking or what have you.

Q.    You said that to the extent that there was exposure to asbestos, it was from packing; is that correct?

A.    Correct.

Q.    That was internal to the valve?

A.    Yes.

Q.    Can you tell me how you would access the internal section of the valve to reach the packing?

A.    A bonnet nut on top that you would take off and pull the packing out.

Q.    Do you know what kind of valves they were, a globe, a check, a butterfly, what type?

A.    No.

Q.    What was the size of the valves in the rafter section?  Were they uniform or did they vary?

A.    They all varied.  Depending where the branches went to.

Q.    Size?

A.    I would say a half-inch would probably have been the smallest in that building.  The largest were maybe four inch,

4

maybe larger.

Q.    All right.  Was packing found in every single valve you worked on?

A.    To my knowledge, yes.

*Id.* at 174-177.

\* \* \* \* \*

Q.    So, when you opened the valve up and saw the packing, what did the packing look like in terms of consistency?

A.    Again, depending what it was, I remember a silver sparkle color, grey.  You know, silver sparkles, grey.  Usually that stuff would just get picked out.  It didn't come out in one solid piece.

Q.    You said you were going up because it was leaking.  Was the packing wet?

A.    Like when it was removed?

Q.    When you went in and opened up the valve to remove the packing because it was leaking, was the packing dry or wet?

A.    Because of the material they are made out of, the packing don't absorb water.  The outer parts were wet, but not the actual packing itself.

Q.    So, you had to pick it out in pieces?

A.    Yeah.  That's the fun part.

*Id.* at 178-179.

\* \* \* \* \*

Q.    How often would you have to work with Mr. Kiefer to repair the valves in the boiler room?

A.    I didn't work in the boiler room a lot.  The more senior guys did that more most of the times, but I remember him being in there a lot of times with them also.

Q.    Do you know how often he was directly performing the work?

A.    In with them?

Q.    Yes.

A.    If I had to put a percentage on for 100, maybe 30 percent of the time he would go in there and take care of something himself.

Q.    The time he was supervising, how close was he to the men working on the valve directly?

A.    Always within arm's reach.

Q.    Not on the lap, but close?

A.    Pretty close.

*Id.* at 186-187.

5

* * * * *

Q.    As you picked the pieces out, where did they go?

A.    Down to the floor.

Q.    They just dropped to the floor?

A.    Correct.

Q.    You didn't make any effort to try to hold onto it or keep it from falling?

A.    Not standing on a ladder.

Q.    The pieces that you pulled out and fell to the floor, you were able to see them easily, they weren't small, like too small to see?

A.    No, not too small to see.

Q.    Do you know how wide a swath underneath a valve this material may have spread and fallen --

A.    No.

Q.    -- to the floor?  Did Mr. Kiefer work directly underneath you, was the ladder at an angle, what was the setup?

A.    It could have varied.  Sometimes we went over a piece of equipment or over a work station but he would probably always be -- well, he was always at the bottom of the ladder, what we call footing a ladder, holding his feet on the ladder so it wouldn't move.

Q.    And you had alluded to but there was never really any discussion, during the time that you were on the top of ladder and he was on the bottom, how would Mr. Kiefer have been exposed to asbestos from this valve?

A.    It would have been in the packing and from what I remember about the packings and stuff and what my knowledge is today, some of the packings had asbestos in them.  So, as picking it out and it falling down and basically raining on top of him, I'm sure he was exposed to it in that direction.

Q.    You described the pieces that fell as you being able to see them.  Do you believe that Mr. Kiefer inhaled the pieces that you saw?

A.    I would say he didn't inhale the big pieces that I pulled out but the --yeah, out of the picking and, you know, breaking it apart and pulling pieces out, I'm sure he would have -- some of the little particles that were in the air he, you know, would breathe in.

Q.    So, as you were working on the valve and picking the pieces out, you were also disturbing some of the dust in the immediate vicinity around you, right?

A.    Yes, I would say that's fair.

Q.    So, to some degree whatever was falling below you was the Dust that was up there as well as whatever pieces of packing you were pulling out, correct?

A.    Could have been, yes.

Q.    So, you talked about particles, the particles that Mr. Kiefer

6

could have inhaled may have been the dust as opposed to
whatever was raining down from the valve; is that right?

A.  Or both, yes.

Q.  Or both, that's fair. And am I correct that at the time you
worked with the valves, I mean, this packing, you didn't have
specific knowledge as to whether the packing contained
asbestos, correct?

A.  Correct.

Q.  You stated that it was gray with some sparkles and silver and
that it's only later that you now understand that you believe
that some of that may have contained asbestos?

A.  Correct.

*Id.* at 212-215.[1]

**B.    Crane Recommended and Sold Asbestos-Containing Components, Like Packing and Gaskets, for Use in Their Valves and Even Recommended the Use of External Asbestos-Containing Insulating Cement on Their Valves**

7.      Crane's Answers to Interrogatories concede that their valves contained

asbestos components. *See* Crane Co.'s Answers to Plaintiffs' Master Interrogatories and

Request for Production re: Case No. CC-99-08033-B, *Malcolm Lee Murphy v. Owens*

*Corning et al.* page 6, attached hereto as **Exhibit 5.** Specifically, page 6 states:

> Crane Co.'s principal line of industrial equipment…was industrial
> valves….Many of those valves bore the name "Crane", marked
> directly on the valve. Certain of the valves had enclosed within their
> metal structure asbestos-containing gaskets, packing, or discs.

Crane Co.'s valves contained asbestos-containing materials from approximately 1858

until the mid-1980's. *See id.* at pg. 9. Crane sold asbestos-containing Cranite gaskets,

---

[1] Crane's suggestion that Mr. Galante's extensive testimony and product identification is
inadmissible and should not be considered, and that he had no personal knowledge regarding Mr.
Kiefer's exposure to asbestos packing contained within Crane valves, in addition to being belied
by the record, has been previously rejected by New York courts and is without merit. *See, e.g.,*
*D'Alessandrio v. A.O. Smith Water Prods. Co.,* Index No. 190273/2009 (N.Y. Sup. Ct. August 6,
2010) at 3 (attached hereto as **Exhibit 4**) ("Given this testimony, plaintiff demonstrated that he
possessed sufficient knowledge of the facts contained in the document such that its use to refresh
his memory was proper. Further, once plaintiff named the defendant as a potential source of his
asbestos exposure, he was able to recall specific instances (not contained within the list) of seeing
the Crane Co. name on pumps that he worked near in sewage plants as well as the LILCO and
Con Ed power plants").

packing, and discs until sometime in the 1970's or 1980's. *See id.* at 8-10 (75%-85% chrysotile asbestos). Crane never provided a warning regarding the asbestos-containing components of their valves until the mid 1980's. *See id.* at pg. 14.

8.     In addition to selling valves with asbestos components, Crane also knew (and even recommended) that asbestos-containing insulation was being applied to the exterior of their valves *to prevent heat loss/dissipation.* In 1925, Crane Co. published a study course manual for Crane employees with a section entitled, "Insulation." *See* Crane Co. "Study Course for Employees," 1925, relevant portions attached hereto as **Exhibit 6.** This section imparts the reasons why insulation was needed on Crane equipment and specifically discusses asbestos insulation. This section is replete with Crane's explicit pronouncements and instructions that high heat applications require insulation, specifically asbestos insulation, on the valves. *See id.* at 156 (discussing the thickness of the "asbestos fibers" when Cranite sheets are "pressed together under heat"; stressing that the "cheaper" Cranite sheets are "unsatisfactory" "under high pressures and temperatures").

9.     Crane <u>sold</u> asbestos-containing materials that were used in association with its equipment, including valves. The asbestos-containing materials that Crane sold included gaskets, packing, pipe-covering, millboard, block, and insulating cement. *See* excerpts from Crane "Valves and Fittings for all Pressure and Purposes, Catalogue No. 51, dated June 1923, attached as **Exhibit 7**; *see* excerpts from "Crane Industrial Supplies," Catalog 45J, dated 1945, attached as **Exhibit 8**; *see* excerpts from "Crane valves fittings pipe fabricated piping," No. 53, dated 1953, attached as **Exhibit 9.** In marketing J-M Asbestos Cement, Crane wrote in its catalog that the asbestos cement was "...well known for [its] excellent coverage, good finish and insulating properties."

Furthermore, "[J-M Cements] are especially suitable for insulating irregular surfaces where it is impractical to apply sectional insulation, sheets, or blocks. *See* Exhibit 7 at 141. Again, this is to ensure that only asbestos-containing cement is used in situations where the maximum Fahrenheit temperature is between 700 and 1000 degrees. *See id.* And, just to be certain that the buyer knew where to apply the Johns-Manville asbestos cement, Crane wrote in subsequent catalogs, "Johns-Manville cements are unexcelled for insulation of irregular surfaces such as on <u>valves</u>, flanges, pipe fittings, etc., or as a surface finish over block or sheet insulations in order to seal joints and to provide a smooth, durable finish." (emphasis added). *See* Exhibit 9, at 455.

10.     In addition, even if Crane had not been so heavily involved in selling and recommending the use of asbestos gaskets, insulating cement, and other asbestos-containing materials for use on and in its valves – which they were – they certainly cannot deny that they were aware that asbestos was being used on and in their valves. As demonstrated above, the 1952 Naval Machinery Manual <u>credits Crane</u> with providing suggestions and descriptive matter, making the manual possible. *See* **Exhibit 10.** This manual, which Crane clearly had a hand in creating, specifies that asbestos gaskets and packing were to be used in valves and asbestos insulating cement on valves when used for high temperature applications. *See id.* This is further demonstrated by Crane Co.'s own schematics for naval vessels, which document its design of naval valves incorporating asbestos containing parts, to wit asbestos valve stem packing, compressed asbestos gasket, and stuffing box packing. *See* **Exhibit 11** (paragraph 16); Chart entitled "List of Materials" at 23 and 42.

11.     Lastly, Exhibit 12 establishes that *Crane did specify the use of asbestos materials for valve and pump packing and gaskets. See* **Exhibit 12.** The first sheet, for example (Crane Co. Drawing m 22419) is Crane's valve specification, and at the top right

9

box specifies "braided asbestos" as the requisite valve packing material, and "compressed asbestos" for the valve gasket. *Id.* The next page, a Crane "sheet packing" materials sheet dated March 17, 1972, requires that "[t]his packing shall consist of asbestos fiber" and so forth. *Id.* The next page, a "'Cranite' sheet packing" specification dated August 26, 1957, requires that "[p]acking shall consist basically of 75 to 85% Chrysotile asbestos." *Id.* The further pages included in this exhibit similarly evidence Crane's persistent specification of asbestos-containing valve and pump components. *Id.*

**C.    The Summary Judgment Standard**

12.    Based upon the proofs marshaled by Plaintiff herein, it is clear that Defendant's instant motion for summary judgment should be denied. It is well settled in New York that the court must view all of the evidence in the light most favorable to the non-movant. *See Strychalski v. Mekus*, 54 A.D.2d 1068 (4th Dept. 1976); *Henderson v. City of New York*, 178 A.D.2d 129 (1st Dept. 1991). Moreover, summary judgment is a "drastic remedy" that must not be granted if there is "any doubt" about the existence of a triable issue of fact. *See Nicholas Di Menna & Sons v. City of New York*, 301 N.Y. 118 (1950); *Ace Wire & Cable Co. v. Aetna Casualty & Surety Co.*, 60 N.Y.2d 390 (1983).

13.    "On a motion for summary judgment, the court is not to pass on the credibility of the witnesses, but rather must determine whether material issues of fact exist. The function is issue finding, not issue determination." *Stankowski v. Kim,* 730 286 A.D.2d 282 (1st Dept. 2001) (holding that issues that 'turn largely on witness credibility and are inappropriate for summary judgment treatment').

14.    Accordingly, a party moving for summary judgment cannot meet its burden merely by noting gaps or weakness in its opponent's proof. *See Cochrane v. Owens-Corning Fiberglass Corp.,* 219 A.D.2d 557 (1st Dept. 1995)(holding that, in the context of summary judgment proceedings, "[t]he credibility of the parties is not an

appropriate consideration for the court..., and statements made in opposition to the motion must be accepted as true"). *See also Allen v. General Elec. Co.*, 32 A.D.3d 1163 (4th Dept. 2006).

15.    In the same vein, the First Department has unequivocally ruled that "[t]he deposition testimony of a litigant is sufficient to raise an issue of fact so as to preclude the grant of summary judgment dismissing the complaint . . . . The assessment of the value of a witnesses' testimony constitutes an issue for resolution by the trier of fact, and any apparent discrepancy between the testimony and the evidence of record goes only to the weight and not the admissibility of the testimony." *Dollas v. W.R. Grace & Co.*, 225 A.D.2d 319, 321 (1st Dept. 1996).

16.    It is also well settled that, in a personal injury litigation, the plaintiff is not required to show the precise cause of his damages, but only facts and conditions from which defendant's liability can be reasonably inferred.  The same standard is particularly applicable in the context of defendant's motion for summary judgment, where the plaintiff need only show the existence of triable questions of fact, and where any doubt must be resolved against summary resolution. *See Reid v. Georgia Pacific Corp.*, 212 A.D. 2d 462 (1st Dept. 1995); *see also* NYPJI 2:12.  This principle is especially pertinent in the context of asbestos-related personal injury cases, which involve tragic injuries that do not manifest until many years, and typically decades, after the plaintiff's injurious exposures.

17.    Further, because the remedy of summary judgment is a drastic one, the moving defendant is charged with the heavy initial burden of showing that it did not breach its duty of due care and did not cause the harm afflicting the plaintiff. *See Field v. Waldbaum, Inc.*, 35 A.D.2d 652 (2d Dept. 2006); *Jones v. Surrey Coop. Apts., Inc.*, 263 A.D.2d 33 (1st Dept. 1999) (reiterating that, "on [a] motion for summary judgment it was

11

the movant's burden to establish the non-existence of those elements")(court's emphasis; omitting internal citations). Toward this end, "[t]he proponent of summary judgment must eliminate material issues of fact by producing 'evidentiary proof in admissible form'." *See Zuckerman v City of New York*, 49 N.Y.2d 557 (1980).

18.     As such, a defendant moving for summary judgment must "make a prima facie showing of entitlement to summary judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact." *Ayotte v. Gervasio*, 81 N.Y.2d 1062 (1993)(*quoting Alvarez v. Prospect Hospital*, 68 N.Y.2d 320, (1986)). The failure to make such a showing requires the denial of a summary judgment motion, "regardless of the sufficiency of the opposing papers." *Id.* Every one of the movant's main assertions must be supported by evidence proffered by that movant, because "conclusory assertions are insufficient to demonstrate the absence of any material issues of fact." *Id.*

19.     The Court is respectfully referred to the annexed Memorandum of Law for an analysis of the relevant case law regarding the rebuttal of Crane's "Bare Metal" defense, attached hereto as **Exhibit 13**.

20.     WHEREFORE, for all of the facts marshaled above, and the relevant case law referenced in the Plaintiff's Memorandum of Law, the Plaintiff respectfully submits

that Crane's motion must be denied in its entirety.

Dated:  New York, New York
November 22, 2013

Respectfully submitted,

By_____
David A. Chandler (DC6082)
WEITZ & LUXENBERG, P.C.
700 Broadway
New York, New York 10003
(212) 558-5914
Attorneys for Plaintiffs